2013 ND 184

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Leron Lee HOWARD, Defendant and Appellant.**

No. 20120422.

Supreme Court of North Dakota.

Oct. 22, 2013.

Rehearing Denied Nov. 21, 2013.

Frederick R. Fremgen, State's Attorney, Jamestown, ND, for plaintiff and appellee.

Mark T. Blumer, Fargo, ND, for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶1] Leron Howard appealed from a criminal judgment entered after a jury found him guilty of murder and criminal conspiracy. Howard argues the district court erred in directing a multi-county jury panel under N.D.C.C. § 27–09.1–05.1, and in denying his amended motion for change of venue. He also argues there was insufficient evidence to support his conviction. We affirm the judgment.

I

A.

[¶2] In April 2011, the body of Abdi Ali Ahmed was discovered down a muddy embankment along the side of a rural gravel road in Stutsman County, near Jamestown. At trial, Sheriff's Deputy Falk testified, after examining the body at the crime scene, he noticed two apparent stab wounds, one in the victim's abdomen and the other in the victim's rib area. Deputy Falk testified there were also abrasions on the victim's chest and lacerations on the forearms and wrists. State Forensic Examiner Dr. William Massello, who conducted the autopsy, testified he determined Ahmed's cause of death was from a blunt head injury and a stab wound to the abdomen.

[¶3] On the night of April 29, 2011, Ahmed was seen socializing with Howard at a bar in Jamestown and later at a house party. In the early morning hours of April 30, Howard and Ahmed left the house party together along with Janelle Cave. Cave drove Howard and Ahmed to her trailer. Soon after arriving, Howard and Ahmed were involved in a physical altercation that took place outside the trailer. Cave and Howard's testimony concerning the fight conflicts substantially.

[¶4] Howard testified he observed Ahmed and Cave arguing and "it looked like [Ahmed] was fixing to make an attempt to put his hands on her ... so my first reaction was to hit him, and I hit him." At trial, Howard admitted he struck Ahmed twice in the head. Ahmed fell to the ground and Howard "kicked him a couple times" while Ahmed was down. Howard testified, "I kicked [Ahmed], and then it seemed like he kicked me back, so ... I grabbed him by his legs and I drug him from one side of the street to the other side of the street." After striking Ahmed in the head and dragging him across the pavement, Howard was uncertain whether Ahmed was conscious. He testified Ahmed was mumbling, and he could not understand what he said. Howard then testified he said the following to Ahmed, " 'I'm sorry. I'm going to fix this. I'm going to get you some weed,' ... and

then it seemed like he had a lot of trouble getting up, so I helped him up." Howard put Ahmed in the backseat of Cave's car.

[¶ 5] Cave testified she did not have an argument with Ahmed. She testified Howard and Ahmed walked out of the trailer together while she was inside. Shortly thereafter, she went outside and discovered Ahmed laying on the ground "all the way across the street." Cave testified she checked Ahmed's pulse and felt his heartbeat. She tried to wake Ahmed up by nudging him. Cave was uncertain how long Ahmed had been unconscious. Cave testified Howard dragged Ahmed across the street and placed him on the floorboards in the backseat of her car.

[¶ 6] Howard and Cave both testified that Cave drove the three of them to Delmonty Jones's residence to smoke marijuana. It is unclear whether Ahmed was conscious during the drive to Jones's house. The State alleges that prior to leaving for Jones's residence, someone retrieved Cave's decorative sword from her trailer and placed it in the car. Cave testified she did not take the sword out of her house or see Howard do likewise. Howard also testified he did not put the sword in the car or see Cave put the sword in the car.

[¶ 7] Howard and Cave both testified that, after reaching Jones's house, they left Ahmed in the car while they smoked marijuana inside the residence. Howard testified the following dialogue transpired: " 'Old boy [Ahmed] out in the car probably want to smoke,' but [Cave] was like, 'Oh, he's not—he ain't even responding. Like, he's not moving or anything.' " Cave testified Howard told Jones "there was a body in the car." Jones testified Howard brought a sword wrapped in a blanket into the house. Jones then testified Howard told him "I want to put—put a body in your well." Cave testified Howard and Jones joked about what to do with the body and Jones laughed and said, "just put him in the field." Howard and Cave left approximately ten to twenty minutes later and headed back toward Cave's trailer. Howard took the sword with him. Cave was driving. It is unclear whether Ahmed was conscious in the backseat.

[¶ 8] At some point the car was stopped, Ahmed was thrown out of the car, stabbed, and left in the gravel road. Howard and Cave each testified they were present when Ahmed was stabbed, but they each place the blame on the other party. Cave testified she pulled over and put her car in park because the dome light came on. She exited the vehicle because Howard got out and she went around the car and stood near the passenger side taillight. Cave testified Howard pulled Ahmed out of the backseat of the car. Cave testified she saw the tip of the knife and saw Howard kick and stab Ahmed. She testified it appeared Ahmed was kneeling when Howard stabbed him. Cave testified she and Howard got back in the car and she drove to the James River. Cave testified she threw the sword in the river. The sword was discovered on the riverbank in early 2012 by a fisherman.

[¶ 9] Howard's testimony conflicts substantially. Howard testified that, on the trip back to Cave's trailer, Cave hit the brakes and said, "I don't want [Ahmed] in the car." In response, Howard grabbed Ahmed from the backseat and threw him out of the car. Howard testified before he was all the way out of the car, "[Cave] was already coming around the car, and I didn't think anything of it, and I was like, 'You've got to get out,' and [Ahmed] was mumbling still. So I let him go, and then that's when she proceeded to just hit him with the knife out of nowhere...." Howard testified Cave swung the sword at Ahmed and then stabbed him twice. How-

ard testified he jumped back in the car out of shock, looked in the rearview mirror and last saw Ahmed standing in the middle of the road while he and Cave drove away. Howard testified Cave put the sword in a towel and put it on the side of the driver's door with her. He testified he did not see the sword again until trial.

### B.

[¶ 10] Howard and Cave were charged with murder and criminal conspiracy. They were scheduled to have a joint trial. Prior to the trial, the State moved to sever the joint trial. The motion was granted. Cave was tried and convicted of conspiracy to commit murder and manslaughter in February 2012.

[¶ 11] Howard's trial was scheduled for August 2012. Given the high publicity of the case, the district court indicated it was considering enlarging the jury pool under N.D.C.C. § 27–09.1–05.1 by selecting jurors from multiple judicial districts. The State filed a memorandum opposing the use of § 27–09.1–05.1 to augment the jury pool. Howard did not object to or file a memorandum in support of the use of the statute.

[¶ 12] The district court issued an order directing a multi-county jury panel. The court found, "due to extensive media coverage of the trial of a co-defendant which established a nexus between the two defendants' actions, the number of prospective jurors within Stutsman County is insufficient to obtain an adequate jury pool." As a result of finding the jury pool inadequate, the district court ordered that "[a] panel of 80 prospective jurors shall be summoned for the trial; 60 from Stutsman County and 20 from Barnes County, an adjoining County in the same judicial district." Before voir dire, Howard, relying on the district court's order and Cave's prior conviction in Stutsman County, filed

an amended motion for change of venue arguing that it would be impossible for him to receive a fair trial in Stutsman County and requesting the court to change venue to Cass County. The court denied the motion. The court instructed the "motion may be renewed if examination of potential jurors during voir dire reveals that it is impossible to seat a fair and impartial jury."

[¶ 13] Following voir dire, Howard did not renew his motion for change of venue. At the close of the State's case, Howard made a motion for acquittal on both counts. The motion was denied. The jury returned a guilty verdict on both counts. Howard filed a "Motion for a New Trial and/or Dismissal of Count 2 (Conspiracy)." The court denied the motion.

### II

[¶ 14] Howard argues the court erred in utilizing N.D.C.C. § 27–09.1–05.1 because Stutsman County was not experiencing a natural disaster and was not facing an insufficient number of jurors needed for an adequate jury pool. Under N.D.C.C. § 27–09.1–05.1:

The court, upon its own motion or in response to a motion by a party, may direct that prospective jurors be selected from one or more counties in the judicial district in which the court is located if the court determines that the number of prospective jurors within the county of venue is insufficient to obtain an adequate jury pool. Following notification by the court, the clerk of court of any county in the judicial district shall submit a specified number of names, with mailing addresses, of the prospective, qualified jurors to the clerk of court of the county of venue. If a natural disaster impairs the selection of a sufficient number of prospective jurors in any county, the supreme court, by emer-

gency order, may authorize the court in the affected county to obtain additional names and mailing addresses of prospective, qualified jurors from the clerk of court of an adjoining county or from the clerk of court of another county in the judicial district if a sufficient number of names and addresses is not available from the adjoining county.

[¶ 15] The State argues Howard failed to object to the court's use of N.D.C.C. § 27–09.1–05.1 and that Howard's change of venue motion was not an objection to the court's use of § 27–09.1–05.1. At oral argument, Howard argued his change of venue motion served as an objection to the court's utilization of N.D.C.C. § 27–09.1–05.1. We agree with the State that Howard failed to preserve the issue for appeal. "It is well established that issues not raised in the trial court, even constitutional issues, generally will not be addressed on appeal." *In re R.O.*, 2001 ND 137, ¶ 19, 631 N.W.2d 159. Our review of the record evidences that Howard failed to object to the court's utilization of N.D.C.C. § 27–09.1–05.1.

[¶ 16] Given the facts now before us, we conclude Howard's change of venue motion did not constitute a proper objection to the district court's use of N.D.C.C. § 27–09.1–05.1. Because Howard did not object to the usage of § 27–09.1–05.1 at the district court, that issue is not properly before us.

### III

[¶ 17] Howard argues the court erred in denying his motion for a change of venue. Rule 21(a), N.D.R.Crim.P., provides "[u]pon the defendant's motion, the court must transfer the proceeding against the defendant to another county if the court is satisfied that so great a prejudice against the defendant exists in the transferring county that the defendant cannot obtain a fair and impartial trial there." "A defendant seeking a change of venue under N.D.R.Crim.P. 21(a) bears the burden of demonstrating a reasonable likelihood of prejudice so pervasive that a fair and impartial jury could not be found." *State v. Erickstad*, 2000 ND 202, ¶ 7, 620 N.W.2d 136. "A motion for change of venue is addressed to the sound discretion of the district court, and its decision will not be reversed on appeal absent a showing of an abuse of discretion." *State v. Stridiron*, 2010 ND 19, ¶ 11, 777 N.W.2d 892.

[¶ 18] Additionally, this Court has provided, in cases involving heavy media saturation, the "quantity of media coverage does not control a motion for change of venue; rather, the defendant must show there was prejudicial publicity which caused such bias that it would be impossible to select a fair and impartial jury." *Id.* Furthermore, this Court would "generally prefer" a district court to wait until voir dire is conducted to first determine whether it is possible to select a "fair and impartial jury." *Id.* However, this Court has also indicated "prejudice to a defendant may be so obvious that a change of venue may be ordered immediately." *Id.*

[¶ 19] Here, the court originally denied Howard's motion for a change of venue prior to voir dire. The court cited the rule a change of venue is generally inappropriate before voir dire. The court also stated, "a multi-county jury panel and the use of jury questionnaires should mitigate the effects of pretrial publicity." The court included in its order the motion for change of venue may be renewed "if examination of potential jurors during voir dire reveals that it is impossible to seat a fair and impartial jury." Following voir dire, Howard did not renew his motion.

[¶ 20] Although there was extensive media exposure in this case, the dis-

trict court did not act in an arbitrary, unreasonable, or capricious way in concluding a fair and impartial jury could have been impaneled from the multi-county jury panel. Publicity per se is not necessarily prejudicial or damaging to a criminal defendant. *State v. Ellis,* 2001 ND 84, ¶ 6, 625 N.W.2d 544. Here, the district court instructed that the panel was to be composed of sixty prospective jurors from Stutsman County and twenty from neighboring Barnes County. Juror questionnaires were mailed and returned in advance of trial to screen out prospective jurors tainted by the media coverage. These screening techniques as well as voir dire itself served as an effective barometer for the court to evaluate potential juror taint.

[¶ 21] The case at bar is analogous to our decision in *Stridiron* in which we affirmed a district court's denial of a defendant's motion for change of venue based on prejudicial pretrial publicity. *Stridiron,* 2010 ND 19, ¶ 14, 777 N.W.2d 892. *Stridiron* similarly involved two co-defendants in a murder trial. Stridiron, who was on trial for felony murder, made a motion to disseminate a public opinion survey and for a change of venue based upon alleged prejudicial pretrial publicity. *Id.* The district court denied the motion and instead prepared its own "extensive questionnaire for potential jurors" to ascertain the level of community bias created by the media attention the case garnered. *Id.* at ¶ 12. Additionally, each of the empaneled jurors was questioned by the State and the defense during voir dire, and the district court found that it was possible for the defendant to have a fair and impartial jury. *Id.* Under those facts, we concluded the district court did not abuse its discretion in denying the motion for change of venue.

[¶ 22] Here, as in *Stridiron,* those same precautions were taken by the district court to screen for pretrial prejudice. We conclude that the precautions taken by the district court are appropriate in determining whether a criminal defendant can receive a fair and impartial jury. As a result of the actions taken by the district court in gauging the level of pretrial publicity and in working to secure an adequate jury pool, we hold the court did not abuse its discretion in denying the motion for change of venue.

## IV

[¶ 23] Howard argues his murder and criminal conspiracy convictions should be reversed because the evidence is insufficient to sustain the guilty verdicts. We affirm under N.D.R.App.P. 35.1(a)(3), concluding the criminal judgment is supported by substantial evidence.

## V

[¶ 24] The criminal judgment is affirmed.

[¶ 25] DALE V. SANDSTROM, DANIEL J. CROTHERS, MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ., concur.